F I L E D
Clerk
District Court

DEC 2 9 2005

For The Northern Mariana Islands
By_____
(Deputy Clerk)

1  MARK B. HANSON, ESQ.
   First Floor, Macaranas Building
2  Beach Road, Garapan
   PMB 738 P.O. Box 10,000
3  Saipan, Mariana Islands 96950
   Telephone:    (670) 233-8600
4  Facsimile:    (670) 233-5262

5  Attorney for Plaintiff Jiang Li Rong

6

7              IN THE UNITED STATES DISTRICT COURT
                          FOR THE
8                NORTHERN MARIANA ISLANDS

9  JIANG LI RONG,                      )  CASE NO. CV 05 - 0048
                                        )
10            Plaintiff,                )
                                        )
11       vs.                            )
                                        )       VERIFIED COMPLAINT
12  HONG KONG ENTERTAINMENT (OVERSEAS)  )      FOR VIOLATIONS OF THE
    INVESTMENT, LTD., a CNMI corporation doing )  TRAFFICKING VICTIMS PROTECTION
13  business as Tinian Dynasty Hotel and Casino, )        ACT OF 2000,
    NEW ECHO ENTERTAINMENT, INC., a CNMI )    THE FAIR LABOR STANDARDS ACT
14  corporation doing business as Echo Karaoke, )    AND SUPPLEMENTAL STATE LAW
    ALFRED YUE, ZHANG JIAN HUA, ZHANG DE )            CLAIMS
15  MING, ZHANG JIAN GANG, LI LI, LI FENG and )
    Does 1-10,                          )
16                                      )       DEMAND FOR JURY TRIAL
              Defendants.               )
17                                      )
                                        )
18  _____)

19       COMES NOW, JIANG LI RONG with the following Verified Complaint against HONG

20  KONG   ENTERTAINMENT   (OVERSEAS)   INVESTMENT,   LTD.,   NEW   ECHO

21  ENTERTAINMENT, INC., ALFRED YUE, ZHANG JIAN HUA, ZHANG DE MING,  ZHANG

22  JIAN GANG, LI LI, LI FENG and several unnamed doe defendants:

23

24

25

26

27

ORIGINAL

INTRODUCTION

"As the 21st century begins, the degrading institution of slavery continues throughout the world. Trafficking in persons is a modern form of slavery, and it is the largest manifestation of slavery today. At least 700,000 persons annually, primarily women and children, are trafficked within or across international borders. Approximately 50,000 women and children are trafficked into the United States each year."  Trafficking Victims Protection Act of 2000, § 102(b)(1) (findings of Congress).

"Trafficking in persons is not limited to the sex industry. This growing transnational crime also includes forced labor and involves significant violations of labor, public health, and human rights standards worldwide." *Id.*, §102(b)(3).

"Traffickers primarily target women and girls, who are disproportionately affected by poverty, the lack of access to education, chronic unemployment, discrimination, and the lack of economic opportunities in countries of origin. Traffickers lure women and girls into their networks through false promises of decent working conditions at relatively good pay as nannies, maids, dancers, factory workers, restaurant workers, sales clerks, or models." *Id.*, §102(b)(4)(in part).

"Traffickers often transport victims from their home communities to unfamiliar destinations, including foreign countries away from family and friends, religious institutions, and other sources of protection and support, leaving the victims defenseless and vulnerable." *Id.*, §102(b)(5).

"Victims are often forced through physical violence to . . . perform slavery-like labor. Such force includes . . . torture, starvation, imprisonment, threats, psychological abuse, and coercion." *Id.*, §102(b)(6)(in part).

"Traffickers often make representations to their victims that physical harm may occur to them or others should the victim escape or attempt to escape. Such representations can have the same coercive effects on victims as direct threats to inflict such harm." *Id.*, §102(b)(7).

"Trafficking also involves violations of other laws, including labor and immigration codes and

laws against kidnapping, slavery, false imprisonment, assault, battery, pandering, fraud, and extortion." *Id.*, §102(b)(10).

"Because victims of trafficking are frequently unfamiliar with the laws, cultures, and languages of the countries into which they have been trafficked, because they are often subjected to coercion and intimidation including physical detention and debt bondage, and because they often fear retribution and forcible removal to countries in which they will face retribution or other hardship, these victims often find it difficult or impossible to report the crimes committed against them or to assist in the investigation and prosecution of such crimes." *Id.*, §102(b)(20).

Some of the many indications of force, coercion and fraud involved in human trafficking include:

- traffickers promise valid immigration or travel documents;
- victims are instructed by traffickers to use false identity and travel documents;
- victims do not know by whom or how identity or travel documents were obtained;
- traffickers obtain official documents and make the travel arrangements;
- victims are escorted through travel and entry process by traffickers;
- identification and travel documents of victims are taken away by traffickers upon arrival;
- victims sign contracts to do legitimate work, but are then required to do work that is different from what was originally described;
- victims do not know or understand the terms of the contracts they sign — the contracts are in a language the victims cannot read;
- victims are promised money, salary or earnings that never materialize or are only sporadic;
- victims are lied to about aspects of travel, employment, living conditions and treatment;
- traffickers manipulate victims' earning ability to coerce victims into performing other acts to make money;
- traffickers threaten to turn victims over to the authorities with expectation that the victims will be imprisoned or treated harshly;
- traffickers threaten to have victims deported;
- traffickers threaten to harm the victims or their friends or family if victims reveal anything about the trafficking, their conditions or if they complain to authorities;
- traffickers beat, kick and batter victims;
- traffickers use verbal or psychological abuse that intimidates, degrades and frightens the victims;
- traffickers make false accusations of abuse or neglect, particularly of children, or criminal activity about the victim;

Donna M. Hughes, *Hiding in Plain Sight, A Practical Guide to Identifying Victims of Trafficking in the U.S.*, October 2003.

The Salvation Army has also identified a number of control mechanisms used by human traffickers:

1. <u>Intimidation and threats</u> - brutal violence, rape, emotional abuse, watching violence against other victims; threats to leave, threats of torture or murder the victim, their loved ones or pets; blackmail (sending pornographic photos of victims to schools, family and acquaintances), torture and the threat of being resold (incurring new debt for some).

2. <u>Lies and deception</u> - used to achieve cooperation from victim and/or their family; usually involves making false promises of employment; can also pertain to hidden cameras (for blackmail), or used by traffickers to frighten victims from turning to law enforcement when in a foreign country. In sex trafficking, this often involves feigned romantic interest (see emotional manipulation).

3. <u>Money</u> - a very common form of control; victims transported by traffickers often incur debt that they owe traffickers. They are then forced to work to pay it off. This is debt bondage. But money is used in several other ways, as well, especially in sex trafficking. Sex traffickers often require victims meet quotas, such as $1000 on weeknights and up to $1500 on weekends.  They are often beaten mercilessly or not allowed to enter their home unless the quota is met. Many must also turn over all or most of the money to their traffickers or be severely punished.  One trafficked girl explained how her trafficker burned another girl to death right in front of her and other girls under the trafficker's control for attempting to keep some of the money.  With the money, traffickers "care" for the victims by paying rent, buying food, clothes, etc.; this increases their feelings of indebtedness towards them.

4. <u>Unsafe, unpredictable and uncontrollable events</u> - never allowing the victims to feel safe destabilizes them and communicates that they have no power or control over their situations and their lives are completely dependent upon their abusers. Starvation is a common example.

5. <u>Emotional abuse</u> - weakening of the victim's will through intentional deflation of his or her self esteem with constant insults instilling feelings of worthlessness and inferiority.

6. <u>Emotional manipulation</u> - Young victims are especially susceptible to the use of emotional manipulation to achieve control.  Traffickers use cycles of seduction, rejection and abuse to convince victims that they actually care for them.  The victims focus upon the affection that they need and are made to believe that they deserve the negative treatment they receive for disobedience.

7. <u>Social isolation</u> - the victims are separated from their support networks and moved around from place to place to prevent them from developing relationships. This can also include the designation of one girl in a trafficker's "stable" as a favorite to create jealousy and distance between them.

8. <u>Forced / intentional drug addiction</u> (especially crack).

9.  <u>Identity control</u> - Traffickers often attempt to control a victim's sense of self, especially in long-term situations. Victims of sex trafficking are often given new names and appearances to demonstrate that the traffickers not only own them but created a new person out of them specifically for purposes of sexual exploitation. The goal is to completely dominate, own and control the victim, or make it difficult to distinguish between his or her true self and the identity created through exploitation.

10. <u>Traffickers fathering children of victims</u> - Traffickers father babies with the victims, then take them away to be cared for by the trafficker's family so that she is bound to him and obeys to prevent harm to the baby.

The Salvation Army, *What is Human Trafficking?* (2005) (citations omitted).

Challenges to the identification of and the provision of assistance to victims of human trafficking include:

1.  Trafficked persons tend not to ask for support due to:

    • Shame, embarrassment or stigma
    • Self-blame due to degradation and brainwashing process routinely used to control victims. This can result in an inability to view self as a victim
    • Fear of retaliation or deportation
    • Isolation or lack of social support and connections
    • Learned helplessness
    • Lack of knowledge of available services
    • Lack of knowledge of victims' rights
    • Lack of trust
    • Language differences
    • Cultural differences
    • Feeling of indebtedness to traffickers

2.  Trafficked persons also tend to have low levels of formal education and/or unique cultural backgrounds and:

    • Find it difficult to navigate the court system
    • Based on their experience in home countries may perceive law enforcement as threatening or unreliable

3.  Trafficked persons may be immigrants that:

    • Are trafficked within "closed" ethnic communities, which means that victims, traffickers and abusers (customers, johns) are of the same ethnicity - Russian, Indian, Korean, Mexican, etc.
    • Are not aware of their rights and legal protections
    • Fear retribution from traffickers
    • Feel intimidated by a system that they believe seeks to punish them

1

2     4.     There are specific *cultural barriers* to accessing victim cooperation:

3        • Women from some cultures may be reluctant to seek assistance in cases of sexual abuse or violence

4        • In some religions and cultures women are taught to assume a "submissive" role to men

5        • Violence from men may be tolerated and viewed as "normal" in some cultures

6        • Victims may believe that it is "normal" for them to be beaten and enslaved since they are undocumented

7        • Victims may risk social ostracizing and social stigmatization

        • Women may fear that relatives will discover their involvement in prostitution

8        • Men from some cultures may be reluctant to admit that they have been victimized or felt afraid

9

10    The Salvation Army, *How to Identify Victims of Human Trafficking* (2005) (citations omitted).

11    There is no doubt that human trafficking is alive and well in the Commonwealth of the

12  Northern Mariana Islands.

13                          JURISDICTION

14    1. The Trafficking Victims Protection Act of 2000 and the Trafficking Victims Protection

15  Reauthorization Act of 2003 apply to this matter pursuant to the express terms of §§ 103(10) and

16  103(12) of Public Law 106-386, §4(a)(4) of Public Law 108-193 and 18 U.S.C. § 1595 as they apply

17  through the Covenant to Establish a Commonwealth of the Northern Mariana Islands in Political

18  Union with the United States of America, 48 U.S.C. § 1801 *et seq.*

19    2. This Court has jurisdiction over Plaintiff's human trafficking claims pursuant to 28 U.S.C.

20  § 1331 (federal question jurisdiction) and 28 U.S.C. § 1337(a) (proceedings arising under any Act

21  of Congress regulating commerce).

22    3. The Fair Labor Standards Act, 29 U.S.C. §§ 201 *et seq.* ("FLSA"), applies to this matter

23  through the Covenant to Establish a Commonwealth of the Northern Mariana Islands in Political

24  Union with the United States of America, Article V, § 502(a)(2).

25    4. This Court has jurisdiction over Plaintiff's FLSA claims pursuant to 28 U.S.C. § 1331

26  (federal question jurisdiction) and 28 U.S.C. § 1337(a) (proceedings arising under any Act of

27

1   Congress regulating commerce).

2       5.   This Court also has jurisdiction under the FLSA, 29 U.S.C. § 216(b) to adjudicate

3   Plaintiff's claims.

4       6.   This Court has jurisdiction over Plaintiff's non-FLSA claims pursuant to 28 U.S.C. §

5   1367(a) (supplemental jurisdiction).

6       7.   Venue is properly placed in this Court as at all relevant times Plaintiff was an employee

7   of Defendants doing business in the Commonwealth of the Northern Mariana Islands ("CNMI").

8                                    PARTIES

9       8.   Plaintiff Jiang Li Rong ("Ms. JIANG" or "Plaintiff") is a citizen of the People's Republic

10  of China currently residing in Saipan, CNMI and is a victim of human trafficking.

11      9.   Upon information and belief, Defendant Hong Kong Entertainment (Overseas)

12  Investment, Ltd. ("TINIAN DYNASTY") is a CNMI corporation doing business as, *inter alia*, Tinian

13  Dynasty Hotel and Casino, with its principal place of business in San Jose, Tinian, CNMI.  Among

14  other illegal acts of the defendant, TINIAN DYNASTY employed Plaintiff and facilitated her

15  transportation to Saipan, CNMI where Plaintiff became a victim of human trafficking.

16      10.  Upon information and belief, Defendant New Echo Entertainment, Inc. ("ECHO

17  KARAOKE") is a is a CNMI corporation doing business as Echo Karaoke with its principal place of

18  business in Garapan, Saipan, CNMI.  Also upon information and belief, ECHO KARAOKE is a

19  brothel incorporated by Defendant ALFRED YUE in the red light district of Saipan.  ECHO

20  KARAOKE purported to employ Plaintiff for part of the time Plaintiff was employed in Saipan; it is

21  the principal business of other defendants; and ECHO KARAOKE is another entity used as a

22  mechanism in a scheme or plan by the defendants herein to take actions that caused Plaintiff to

23  suffer and to continue to suffer injuries as a victim of human trafficking.

24      11.  Upon information and belief, Defendant ALFRED YUE is a individual and a United

25  States citizen who currently resides in San Jose, Tinian, CNMI.  At all times relevant hereto,

26

27

ALFRED YUE was the managing director of Defendant TINIAN DYNASTY and the natural father of a child born to ALFRED YUE and Defendant ZHANG JIAN HUA. At all times relevant hereto, ALFRED YUE was an active and knowing participant in a scheme or plan that caused Plaintiff to suffer and to continue to suffer injuries as a victim of human trafficking. At all times relevant hereto, ALFRED YUE exercised sufficient control and influence over the other defendants herein, both directly and indirectly, to cause and/or to assist other defendants to take actions that caused Plaintiff to suffer and to continue to suffer injuries as a victim of human trafficking.

12. Upon information and belief, Defendant ZHANG JIAN HUA is a individual and a citizen of the People's Republic of China who currently resides in Capitol Hill, Saipan, CNMI. At all times relevant hereto, ZHANG JIAN HUA was the manger and a stakeholder in fact of Defendant ECHO KARAOKE and the natural mother of a child born to ZHANG JIAN HUA and Defendant ALFRED YUE. At all times relevant hereto, ZHANG JIAN HUA was an active and knowing participant in a scheme or plan that caused Plaintiff to suffer and to continue to suffer injuries as a victim of human trafficking. At all times relevant hereto, ZHANG JIAN HUA exercised sufficient control and influence over the other defendants herein, both directly and indirectly, to cause and/or to assist other defendants to take actions that caused Plaintiff to suffer and to continue to suffer injuries as a victim of human trafficking.

13. Upon information and belief, Defendant ZHANG DE MING is a individual and a citizen of the People's Republic of China who's current residence is unknown to Plaintiff. ZHANG DE MING was at all times relevant hereto a stakeholder of ECHO KARAOKE, the father of ZHANG JIAN HUA and an active and knowing participant in a scheme or plan to transport Plaintiff to the CNMI and to cause and/or to assist other defendants to take actions that caused Plaintiff to suffer and to continue to suffer injuries as a victim of human trafficking.

14. Upon information and belief, Defendant ZHANG JIAN GANG is a individual and a citizen of the People's Republic of China who's current residence is unknown to Plaintiff. ZHANG

JIAN GANG was at all times relevant hereto an employee of ECHO KARAOKE, the brother of ZHANG JIAN HUA and an active and knowing participant in a scheme or plan by the defendants herein to take actions that caused Plaintiff to suffer and to continue to suffer injuries as a victim of human trafficking.

15.  Upon information and belief, Defendant LI LI is a individual and a citizen of the People's Republic of China who's current residence is unknown to Plaintiff.  LI LI was at all times relevant hereto an employee of ECHO KARAOKE and an active and knowing participant in a scheme or plan by the defendants herein to take actions that caused Plaintiff to suffer and to continue to suffer injuries as a victim of human trafficking.

16.  Upon information and belief, Defendant LI FENG is a individual and a citizen of the People's Republic of China who's current residence is unknown to Plaintiff.  LI FENG was at all times relevant hereto an employee of ECHO KARAOKE, the younger sister of Defendant LI LI and an active and knowing participant in a scheme or plan by the defendants herein to take actions that caused Plaintiff to suffer and to continue to suffer injuries as a victim of human trafficking.

17.  Upon information and belief, one or more additional defendants (the "Doe Defendants") who's identities are not presently known to Plaintiff, were knowing participants in a scheme or plan by the defendants herein to take actions that caused Plaintiff to suffer and to continue to suffer injuries as a victim of human trafficking.  Upon ascertaining the true identities of the Doe Defendants, Plaintiff intends to file an amended complaint which will identify them more specifically.

18.  Unless otherwise noted, all references to Defendants herein are references to all above-named Defendants, jointly and severally, regardless of their trade name ("DEFENDANTS").

19.  At all times relevant hereto, DEFENDANTS, and each of them, were acting as agents for each other.

20.  At all times relevant hereto, DEFENDANTS, and each of them, among other violations

of law, jointly, knowingly and willfully, participated in, facilitated, conspired, and aided and abetted, directly and indirectly, in the recruitment, harboring and transportation of Plaintiff JIANG for labor and services in violation of 18 U.S.C. §§ 1589 and 1590.

21. At all times relevant hereto, DEFENDANTS and all of them were joint employers of Ms. JIANG as that term is used in and has been interpreted under the FLSA and the Commonwealth Minimum Wage and Hour Act, 4 C.M.C. §§ 9211 *et seq.* (2000) ("MWHA").

FACTS

22. Plaintiff JIANG is from Yanji City in the Jilin Province of the People's Republic of China.

23. Through a referral from a local recruiting agency in Yanji City, Plaintiff was introduced to Defendant ZHANG JIAN HUA.

24. Defendant ZHANG JIAN HUA stated that she was looking for a suitable person to take care of her infant child.

25. In about October 2004, Plaintiff JIANG went to work for Defendant ZHANG JIAN HUA at Defendant ZHANG JIAN HUA's home in Yanji City where Plaintiff worked for about one month taking care of Defendant ZHANG JIAN HUA's infant child and performing housework for the defendant.

26. After about the first week of working for Defendant ZHANG JIAN HUA in Yanji City, Defendant ZHANG JIAN HUA suggested that Plaintiff JIANG come to Saipan to work as a housekeeper and take care of Defendant ZHANG JIAN HUA's infant child.

27. Defendant ZHANG JIAN HUA told Plaintiff JIANG that JIANG would be paid $250.00 per month for her services as a housekeeper and babysitter in Saipan. Defendant ZHANG JIAN HUA also promised to pay all of Plaintiff JIANG's processing fees, transportation expenses and any other expenses associated with Plaintiff JIANG'S transportation to and employment in the CNMI.

28. Soon thereafter, upon information and belief, Defendants ZHANG JIAN HUA, ALFRED YUE and TINIAN DYNASTY began processing the documents necessary for Plaintiff JIANG's

transportation to and employment in the CNMI.

29. Plaintiff JIANG did not participate in the preparation of her application for employment as a nonresident worker in the CNMI, nor was Plaintiff JIANG informed by DEFENDANTS of the substance of such application, nor were any documents included in her application shown to her and/or translated to her and/or otherwise explained to Plaintiff JIANG. Plaintiff does not speak or read the English language.

30. With the exception of her passport which she presently holds, Plaintiff JIANG has never been provided a copy of her employment contract nor any other documents associated with DEFENDANTS procurement of her transportation to, entry into and employment within the CNMI. DEFENDANTS held and refused to allow Plaintiff to have possession of the entry permit she was issued by the CNMI government.

31. Upon DEFENDANTS' successful procurement of all necessary approval from the CNMI Department of Labor and the Division of Immigration Services, DEFENDANTS had Plaintiff JIANG board a plane from Yanji City, China bound for Saipan, CNMI via Shanghai, China.

32. Plaintiff JIANG was escorted from Yanji to Saipan by Defendant ZHANG JIAN GANG and arrived in Saipan in the early morning of December 29, 2004 where JIANG was met at the airport by Defendant ZHANG JIAN HUA. Jiang was immediately transported to her new home in an apartment of Vestcor Village, Capitol Hill, Saipan, CNMI near the apartment residence of Defendants ZHANG JIAN HUA and LI MEI HUA (the mamasan of ECHO KARAOKE).

33. From her arrival in Saipan until her rescue from DEFENDANTS on May 7, 2005, Plaintiff JIANG was "housed" with four to five other employees of ECHO KARAOKE in the Vestcor Village, three of whom are defendants herein; however, almost all of Plaintiff's time was spent cleaning the various apartments rented by DEFENDANTS and caring for the infant child of Defendants ZHANG JIAN HUA and ALFRED YUE.

34. Almost immediately after Plaintiff JIANG's arrival in Saipan, it became clear to JIANG

that Defendant ZHANG JIAN HUA had no intention of honoring the promises she had made to JIANG in China.  For example, ZHANG JIAN HUA began insisting that JIANG repay ZHANG JIAN HUA for all of the processing fees and transportation expenses ZHANG JIAN HUA incurred in bringing JIANG to work in Saipan.

35.  Soon thereafter, Defendant ZHANG JIAN HUA began insisting also that JIANG pay ZHANG JIAN HUA a recruitment fee similar to the fees paid by other workers to agencies in China for the jobs these workers obtain in Saipan through the agencies.  Defendant ZHANG JIAN HUA insisted that JIANG pay her between 35,000 to 50,000 RMB (approximately $4,300.00 - $6,200.00) as a "recruitment fee," eventually going so far as to physically force JIANG to acknowledge a written promise to pay Defendant ZHANG JIAN HUA the "recruitment fee."

36.  The majority of Plaintiff JIANG's work on Saipan consisted of cleaning, cooking and taking care of the minor child of Defendants ZHANG JIAN HUA's and ALFRED YUE's infant child. However, in addition to this work, JIANG was, on occasion, required to clean the common areas, private rooms and toilet facilities at ECHO KARAOKE.  From the day of her arrival in Saipan on December 29, 2004 through her rescue from Vestcor Village on the morning of May 7, 2005, Plaintiff JIANG worked more than 20 hours per day, seven days per week, with less than 5 hours of each day of her own in which to sleep.

37.  The first payment of a salary JIANG received for her services in Saipan was from Defendant ZHANG JIAN HUA in the amount of $155 on about January 29, 2005.  Defendant ZHANG JIAN HUA explained to JIANG on that day that ZHANG JIAN HUA was withholding $95.00 of the agreed salary of $250.00 per month for repayment of ZHANG JIAN HUA's processing fees.

38.  The second and last payment of a salary JIANG received from Defendant ZHANG JIAN HUA for her services in Saipan was in the amount of $100.00 on about March 3, 2005.

39. Defendant ZHANG JIAN HUA failed and refused to pay JIANG any additional amounts

Page 12 of  28

for wages, insisting that JIANG owed ZHANG JIAN HUA money for processing, transportation and recruitment fees for her employment in Saipan.

40.  Upon information and belief, from the time of Plaintiff's arrival in the CNMI until at least April 28, 2005, Defendant TINIAN DYNASTY was Plaintiff JIANG's employer of record, responsible by CNMI statute for the payment of processing fees, transportation fees, wages, medical expenses and repatriation expenses, among other obligations, associated with Plaintiff JIANG's employment in the CNMI.

41. Defendant TINIAN DYNASTY never provided Plaintiff JIANG with any compensation for the work she performed in the CNMI.

42.  Defendant ALFRED YUE, the father of the infant child for which Plaintiff JIANG cared during her employment with DEFENDANTS, never provided Plaintiff JIANG with any compensation for the work she performed in the CNMI.

43. Also upon information and belief, on or about April 28, 2005, DEFENDANTS purported to cause Plaintiff JIANG to be transferred from the employment of TINIAN DYNASTY to the employment of ECHO KARAOKE as a "waitress" by a consensual transfer approved by the Director of Labor that day.

44. That Grant of Transfer Relief for Entry Permit Number 291817 dated April 28, 2005 purports to be signed by Defendant ZHANG DE MING on behalf of ECHO KARAOKE and Plaintiff JIANG, although the document was never translated and/or explained to Plaintiff (nor wre any other documents associated with Plaintiff's consensual transfer translated or explained to Plaintiff).

45.  Defendant ECHO KARAOKE never provided Plaintiff JIANG with any compensation for the work she performed in the CNMI.

46. No other defendant herein, nor any other third party, ever provided Plaintiff JIANG with any compensation for the work she performed in the CNMI.

47.  Throughout Plaintiff JIANG's employment in Saipan, and in order to keep Plaintiff in their servitude, DEFENDANTS took the following actions, among others:

48.  On about February 16, 2005, Defendant ZHANG JIAN HUA secretly tape recorded Plaintiff JIANG, claimed it was evidence that JIANG was beating her infant child, and threatened to have JIANG arrested by CNMI police for child abuse.  Defendant ZHANG JIAN HUA, with the assistance of her brother Defendant ZHANG JIAN GANG, then proceeded to beat Plaintiff JIANG, berate her, and threaten her.  In addition to their threats to report JIANG to the police, and while they continued to beat JIANG, Defendants ZHANG JIAN HUA and ZHANG JIAN GANG repeatedly  told Plaintiff that she was a slave and they were her masters, that they could and would kill her and throw her into the ocean and nobody would know, and that they would tell Plaintiff's family in China that she was smuggled out of the CNMI and had disappeared.  This beating and berating lasted for almost four hours.

49.  In March of 2005, Defendant ZHANG JIAN GANG beat Plaintiff again purportedly for failing to clean the oven of their apartment which he claimed was a sign she was not doing her job.

50.  In April of 2005, upon returning home from ECHO KARAOKE at around 3:00 a.m., Defendants LI LI and LI FENG, in the presence of and at the direction of Defendant ZHANG JIAN HUA, beat Plaintiff for no stated reason, causing Plaintiff to bleed and swell all over her body and eventually pass out. Following the beating, Defendant ZHANG JIAN HUA told Plaintiff JIANG that if anyone asked about her bruises, Plaintiff was to tell them that Plaintiff had accidentally hurt herself.

51.  Frequently during her employment in Saipan, Defendant ZHANG JIAN HUA would accuse Plaintiff JIANG of stealing from her and would threaten to kill her if she found any stolen items in Plaintiff JIANG's personal things, which Defendant ZHANG JIAN HUA would search from time to time.

52.  Having to suffer continual abuse at the hands of and at the direction of Defendant